The PEOPLE of the State of Colorado, Plaintiff–Appellant,

v.

Christopher George STEPHENSON, Defendant–Appellee.

No. 07SA16.

Supreme Court of Colorado, En Banc.

June 11, 2007.

618

Bill Thiebaut, District Attorney, Tenth Judicial District, Richard W. Dickerson, Deputy District Attorney, Pueblo, Colorado, Attorneys for Plaintiff–Appellant.

Douglas K. Wilson, Colorado State Public Defender, Suzanne C. Reynolds, Deputy Public Defender, Pueblo, Colorado, Attorneys for Defendant–Appellee.

Justice EID delivered the Opinion of the Court.

The prosecution appeals an order by the Pueblo County District Court suppressing statements made by Defendant Christopher Stephenson in response to police interrogation. The trial court found that Stephenson was in custody when he made the statements and had not been given the proper warnings under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We disagree with the trial court's conclusion that Stephenson was in custody and therefore reverse the suppression order.

### I.

The facts of this case come to us from the uncontroverted testimony of Jonathan Post, a Deputy in the Pueblo County Sheriff's Office, who testified at the suppression hearing held in December 2006.

At 11:30 p.m. on September 11, 2006, Deputy Post saw an automobile parked on the right side of the road near the Salt Creek Bridge in Pueblo. The vehicle's hazard lights were blinking while two men poured gasoline into the vehicle's tank. Deputy Post, who was driving a police cruiser, activated his overhead lights and pulled directly behind the parked vehicle. While Deputy Post was parking, the two men entered the parked vehicle.

Deputy Post exited the cruiser and approached the driver's side of the vehicle. There he found Stephenson sitting behind the steering wheel holding the vehicle's keys. Stephenson informed Deputy Post that the vehicle had run out of gas, and that he and his passenger had obtained gas, refilled the tank, and were ready to leave.

Deputy Post believed that Stephenson's appearance and behavior were consistent with the use of a stimulant like methamphetamine. Deputy Post therefore asked Stephenson for his driver's license. Nothing in the record suggests that Deputy Post's request was accompanied by an overt display of force or was made in a threatening manner. Stephenson responded to the request by producing what Deputy Post determined to be a valid driver's license.

Without returning Stephenson's license, Deputy Post then asked for the vehicle's registration. Stephenson was unable to produce the registration, and claimed that the vehicle was loaned to him by its owner, Debra McCarthy. Deputy Post contacted his headquarters to determine the ownership of the vehicle, and was informed that the vehicle's owner was listed as Richard Duvay. Deputy Post told Stephenson of the vehicle's registration, and he again stated that McCarthy had loaned him the vehicle.

Deputy Post then asked Stephenson if he would consent to a search of the vehicle. Again, nothing in the record suggests that Deputy Post's request was made in a threatening manner. Indeed, his exact testimony was that he "asked Mr. Stephenson if [he could] search the vehicle...." Stephenson agreed to the search, and according to Deputy Post, he "had [Stephenson and his passen-

ger] step out of the vehicle [and] behind the vehicle and wait for [him] right next to the bridge." Deputy Post conducted his search while Stephenson and his passenger stood behind the vehicle. The search revealed a small plastic baggie that Deputy Post believed to contain methamphetamine. Deputy Post approached Stephenson and questioned him about it. Stephenson denied its ownership. Deputy Post responded, "Come on, I found this right—right in your seat." Stephenson then admitted that the baggie belonged to him, and was arrested by Deputy Post. At no point during this exchange did Deputy Post provide Stephenson with a *Miranda* advisement.

The baggie contained methamphetamine, and Stephenson was charged with possession of a Schedule II controlled substance. Stephenson moved to suppress his statements to Deputy Post. At a separate hearing ten days after Deputy Post's testimony, the trial court held that Deputy Post conducted a lawful stop of Stephenson's vehicle, and that the statements made by Stephenson prior to Deputy Post's search of the vehicle were admissible because Stephenson was not in custody for purposes of *Miranda*. The trial court further held, however, that statements made by Stephenson after Deputy Post's search were inadmissible because he had not been given his *Miranda* warnings and was in custody when questioned. To support this conclusion, the trial court found that:

> By taking the defendant's license and telling the defendant to remain in the car and then returning to the officer's cruiser for a record's check, and at this point ordering the defendant [and] passenger out of the car, it's this Court's position that the defendant or any other reasonable person under those circumstances would have felt that he was not free to leave, technically under arrest at this point.

The prosecution appeals the trial court's suppression order, arguing that Stephenson was not in custody prior to his formal arrest.

## II.

This case is concerned solely with whether Stephenson was in custody for purposes of the Fifth Amendment at the time he was questioned by Deputy Post about the methamphetamine found in the vehicle. If Stephenson was in custody, then the trial court correctly suppressed his statement because he was not given a *Miranda* advisement prior to Deputy Post's questioning. *See People v. Breidenbach*, 875 P.2d 879, 887 (Colo. 1994).

Custody for *Miranda* purposes under the Fifth Amendment is determined under a different analysis from that applied to determine whether there has been a seizure under the Fourth Amendment. A seizure results under the Fourth Amendment where the police conduct in question "would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *People v. Jackson*, 39 P.3d 1174, 1182 (Colo.2002) (quoting *Florida v. Bostick*, 501 U.S. 429, 439, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). To determine custody for *Miranda* purposes, "the question is *not* whether a reasonable person would believe he was not free to leave, but rather whether such a person would believe he was in police custody of the degree associated with a formal arrest." *People v. Polander*, 41 P.3d 698, 705 (Colo.2001). In order to determine whether a defendant is in custody, "the relevant inquiry is whether a reasonable person in the suspect's position would consider herself deprived of her freedom of action in a significant way at the time of the questioning," tantamount to a formal arrest. *People v. Dracon*, 884 P.2d 712, 716–17 (Colo.1994). Custody is determined from the totality of the circumstances surrounding the defendant's encounter with law enforcement, *see People v. Matheny*, 46 P.3d 453, 468 (Colo. 2002), and we review the trial court's determination de novo, see id. at 459.

### A.

The touchstone of custody is significant curtailment of the defendant's freedom of action that is equivalent to a formal arrest. *See Polander*, 41 P.3d at 705. Significant curtailment often stems solely from the degree of physical restraint placed on the defendant, but sometimes can result from overbearing police interrogation that, accompa-

nied by physical restraint, would cause a reasonable person to believe that he was restrained to the degree associated with a formal arrest. *Cf. People v. Minjarez*, 81 P.3d 348, 357 (Colo.2003) (holding that the tenor and circumstances of the interrogation in question were such that a reasonable person would believe he was under arrest); *Matheny*, 46 P.3d at 462 ("*Miranda* identified the principal threat to the privilege against self-incrimination as the compulsive effect of psychological coercion applied during incommunicado interrogation."). We recognized in *Matheny* that roadside questioning generally does not carry the same degree of psychological coercion as does questioning at a police station. *See* 46 P.3d at 463–64.

For this reason, we rejected a claim of custody in *People v. Reddersen*, 992 P.2d 1176 (Colo.2000), where the trial court erred by suppressing statements made by the defendant in the course of a routine traffic stop. Even though the defendant was outside of the vehicle and searched by a law enforcement officer, the lack of any confinement of the defendant by the officer revealed that the defendant was not in custody at the time of his questioning. *See id.* at 1181. Other cases have focused on the lack of physical restraint when holding that a defendant-motorist was not in custody for purposes of *Miranda*. *See People v. Wallace*, 724 P.2d 670, 674 (Colo.1986) (finding that defendant-motorist was not in custody where "inquiry was made in a normal tone of voice, and no restraints had been placed upon the defendant"); *People v. Archuleta*, 719 P.2d 1091, 1092 (Colo.1986) (rejecting the notion that requiring a defendant-motorist to exit his vehicle created custody, in part because of the absence of any physical restraint).

In contrast, we found that the defendants were in custody when interrogated in *People v. Taylor*, 41 P.3d 681 (Colo.2002), and *People v. Thomas*, 839 P.2d 1174 (Colo.1992). In *Taylor*, the defendant made incriminating statements while "essentially encircled" by law enforcement officers and "pinned" against his vehicle. 839 P.2d at 693, 684. When the defendant in *Taylor* attempted to move, he was physically restrained by law enforcement. *See id.* at 684. Likewise, in

*Thomas*, we found that the defendant-motorist was in custody because, prior to his interrogation, he had exited the vehicle and was searched, the search revealed illegal drug paraphernalia, and another officer arrived at the scene to act as backup while the officer searched the defendant's vehicle. *See* 839 P.2d at 1177–78. We found that the presence of multiple police officers, coupled with the officer's testimony to the court that the defendant was not allowed to leave, was sufficient to establish custody for purposes of *Miranda*. *See id.*

While neither Stephenson nor the trial court cited to it, we also find our decision in *Polander*, 41 P.3d 698, to be instructive. The defendant in *Polander* was one of several passengers occupying a vehicle parked in a restaurant parking lot. *See* 41 P.3d at 701. We affirmed the trial court's suppression of the defendant's statements to the police admitting ownership of drugs found in the vehicle, because prior to questioning, the defendant had been frisked and ordered to remain seated in a certain area next to an associate already in custody, and "it was apparent to all that the police had grounds to arrest" the defendant. *Id.* at 705.

Considering these precedents, we must determine whether Stephenson was restrained to the degree associated with a formal arrest at the time of his questioning by Deputy Post. As we explain in the remainder of this opinion, we find that he was not, and therefore reverse the trial court's suppression order.

**B.**

In this case, the trial court identified three facts that together rendered Stephenson in custody for purposes of *Miranda:* (1) "taking the defendant's license," (2) "telling the defendant to remain in the car," and (3) "ordering the defendant [and] passenger out of the car." We defer to the trial court's factual findings. *See People v. Adkins*, 113 P.3d 788, 791 (Colo.2005). The determination of custody, however, is a legal question that we review de novo. *See Matheny*, 46 P.3d at 459.

■ We cannot agree with the trial court that Deputy Post's request for, and retention of, Stephenson's driver's license was sufficient to create custody for *Miranda* purposes. A non-compulsory request for identification is part and parcel of a routine traffic stop. *See, e.g., People v. Paynter,* 955 P.2d 68, 73 (Colo.1998). To be sure, retaining a motorist's license—even where the license was provided consensually—could give rise to a *seizure* under the Fourth Amendment. *See id.* at 75 ("[T]he sequence of events that occurs *after* a citizen voluntarily provides an officer his identification, including the length of time that the officer retains the identification card ... could ... convert a consensual encounter into a seizure."); *see also Jackson,* 39 P.3d at 1188–89 (collecting cases reaching a similar conclusion). But we have never held that retaining a driver's license goes beyond a seizure and creates custody for *Miranda* purposes. Indeed, Stephenson cites no authority to support the trial court's conclusion that retaining a driver's license creates a level of restraint tantamount to a formal arrest.

■ Beyond taking and retaining Stephenson's license, the trial court found that Stephenson was in custody because he was ordered to remain in his vehicle while Deputy Post checked the vehicle's registration, and subsequently was ordered to exit the vehicle while Deputy Post conducted the consensual search. But these facts, taken with the retention of Stephenson's license, are still not sufficient to support the conclusion that Stephenson was in custody for purposes of *Miranda.*

Instructing Stephenson to remain in his vehicle was not tantamount to a formal arrest. It is a routine aspect of a traffic stop that the motorist will remain in her vehicle while police perform a records check; it is a practice that is motivated by a concern both for the officer's and the motorist's safety. There is no indication from the record that Stephenson was required to remain in the vehicle for an abnormally long period of time while Deputy Post performed his records check, or that Deputy Post made any show of force when instructing Stephenson to remain in the vehicle. We cannot agree that a reasonable person would believe such a mundane order to be a significant restraint on freedom of action tantamount to a formal arrest. *Cf. United States v. Jones,* 933 F.2d 807 (10th Cir.1991) (holding that an order requiring defendant to remain in his living room during a police search was insufficient to establish custody).

■ In a similar fashion, Deputy Post's order that Stephenson exit the vehicle and stand by the bridge while he conducted a consensual search was not a restraint on Stephenson's freedom of action tantamount to a formal arrest. We rejected a similar argument in *Archuleta,* where we held that requiring a defendant to exit her vehicle was not custody for purposes of *Miranda. See* 719 P.2d at 1092. In cases where we have recognized custody as part of a defendant's exit from a vehicle, we have focused on the degree of physical restraint placed on the defendant. *See Polander,* 41 P.3d at 701 (holding that defendant was in custody when she was ordered out of a vehicle, frisked and forced to sit next to the driver, who already was handcuffed and in custody); *Taylor,* 41 P.3d at 693, 684 (finding that defendant was in custody when, after he exited the vehicle, he was "encircled" and "pinned" by law enforcement); *Thomas,* 839 P.2d at 1177–79 (holding that defendant was in custody because of restraints outside the vehicle).

In this case, it was necessary for Deputy Post to have "[Stephenson and his passenger] step out of the vehicle [and] behind the vehicle and wait for [him] right next to the bridge" in order to perform the consensual search. It is difficult to see how a search of a vehicle could effectively be performed with the occupants still inside the vehicle. Similarly, there is nothing in the record to indicate that Stephenson was told to stand "next to the bridge" for any reason other than out of a concern that he stand in a safe place while the search was being conducted. A reasonable person under these circumstances would not understand himself to be in a situation tantamount to a formal arrest.

In sum, the factors upon which the trial court relied—the request and retention of the driver's license, coupled with the instruction to exit the vehicle and stand next to the

bridge while the search of the vehicle was conducted—do not amount to custody because they are not tantamount to a formal arrest. We therefore hold that the trial court erred by finding Stephenson in custody based on the factors identified in its suppression order.

### C.

 While the trial court's suppression order does not address it, the only remaining factor to consider is whether custody was created by Deputy Post's comment to Stephenson, "Come on, I found this ... right in your seat," referring to the methamphetamine found in the vehicle. Deputy Post's statement seemingly is similar to the question asked by police in *Polander*, where we affirmed the trial court's suppression of a defendant's statement on grounds that she was in custody for *Miranda* purposes. *See* 41 P.3d at 705. The key inquiry, however, is not whether a particular question was asked of the defendant, but whether in light of the totality of the circumstances, including the question asked, the defendant was in custody. A review of the facts of *Polander* reveals important distinctions between that case and the one before us now on the issue of custody.

In *Polander*, police approached the vehicle occupied by the defendant after receiving a report of suspected drug activity. *See id.* at 701. Two police officers talked to the driver and asked the occupants to exit the vehicle. *See id.* The defendant was frisked by law enforcement officers and ordered to sit on the curb next to the driver, who was already handcuffed and in custody. *See id.* When the police's search of the vehicle revealed drugs, the police asked the occupants to whom the drugs belonged. *See id.* At this point, "it was apparent to all that the police had grounds to arrest" the defendant and the other occupants of the vehicle. *Id.* at 705. The defendant responded that the drugs were hers, and immediately was handcuffed by police. *See id.* at 701. We found that under these circumstances, the defendant's "freedom of action was curtailed to a degree associated with formal arrest" at the time she was questioned. *Id.* at 705.

The facts of this case are markedly different. Deputy Post encountered Stephenson not on suspicion of drug activity, but because Stephenson appeared to be a motorist stranded late at night. While Stephenson's appearance and behavior led Deputy Post to continue the encounter and ask (and receive) permission to search the vehicle, there was no restraint placed on Stephenson's freedom of action equivalent to the restraint placed on the defendant in *Polander*, that is, to a degree tantamount to a formal arrest. Unlike *Polander*, Stephenson was not ordered to be seated next to someone already handcuffed and in custody; instead, he was standing "next to the bridge" for his own safety and to facilitate the search of the vehicle. And unlike *Polander*, it was not "apparent to all" that there were grounds to arrest him or that he would be arrested. Stephenson repeatedly denied owning the vehicle that he was driving, and Deputy Post's records check confirmed that Stephenson did not own the vehicle where the drugs were found. Under these circumstances, we cannot conclude that a reasonable person in Stephenson's position would believe that he was restrained to a degree tantamount to a formal arrest, regardless of the questions and statements made by Deputy Post.

Absent the deprivation of his freedom of action to such a degree, Stephenson was not in custody when he was asked about the ownership of the drugs found by Deputy Post in the vehicle. Since Stephenson was not in custody when questioned, he was not entitled to be provided with a *Miranda* advisement prior to the questioning. Deputy Post's interrogation was lawful and the trial court erred by suppressing the statements made by Stephenson in response to the questioning.

### III.

For the foregoing reasons, we reverse the trial court's suppression order.