22CA2212 Peo v Crespin 08-07-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA2212
Boulder County District Court No. 21CR2153
Honorable Norma A. Sierra, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Samuel Leo Paul Crespin,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE YUN
Tow and Graham*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced August 7, 2025

Philip J. Weiser, Attorney General, Alejandro Sorg Gonzalez, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, John Plimpton, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1   Samuel Leo Paul Crespin appeals his convictions for possession with intent to distribute methamphetamine, possession with intent to distribute fentanyl, and possession with intent to distribute cocaine.  His only contention on appeal is that the district court reversibly erred by denying his motion to suppress a statement he made to the police.  We affirm.

## I.   Background

¶ 2   One night, a police officer caught a person in the act of shoplifting.  The officer detained the shoplifter, issued him a summons, and then allowed him to leave.  However, the shoplifter did not return to his car in the parking lot and instead left the area on foot.  This led the officer to suspect that the car might be stolen, so he went to investigate it.[1]

¶ 3   Three people were in the car, including Crespin who was in the front passenger seat.  As the officer approached, the person in the driver's seat opened his door, and the officer noticed foil covered in drug residue and other drug paraphernalia near the door handle.  After explaining what had happened with the shoplifter and getting

---

[1] The officer's body camera recorded his encounter with the occupants of the car.

each of the vehicle occupants to identify themselves, the officer told them,

> I do see paraphernalia.  I have seen it, okay?  I will get a dog over here to run it, too.  Just if, again, if you guys are just honest, upfront with me, we can work on it, alright?  If you're not honest, then we're going to have bigger issues.

The vehicle occupants denied having any drugs.

¶ 4      The officer had each person exit the car one at a time to stand by a curb, where another police officer who had just arrived could keep an eye on them.  But when it was Crespin's turn to leave the car, he tried to take a backpack with him and repeatedly refused the officer's command to either allow the officer to search the backpack right then or else leave it behind, leading the officer to twice ask, "Do you need to go in cuffs?"  Eventually, Crespin agreed to leave the bag behind, and the officer thereafter asked if he would consent to a pat-down search, telling him, "You have the right to refuse that."  Crespin refused and went to stand by the other occupants.

¶ 5      The officer then radioed for a drug-detection dog and provided dispatch with the vehicle's identification number.  Dispatch

informed him that, though the vehicle and its license plates were both registered to the shoplifter, the plates were for a different car.

¶ 6 While waiting for the police dog to arrive, Crespin asked to speak with the officer. At the officer's suggestion, they moved away from everybody else to talk one-on-one. Crespin asked why he was being detained, and the officer told him that he was "not free to go" because the car had the wrong license plate on it and that he was "even more . . . not free to go" because of the drug paraphernalia found in car. The officer then asked Crespin, "Is there something in there you want to tell me about?" and Crespin admitted to the officer that there was a handgun in the backpack.

¶ 7 Once the drug-detection dog arrived and alerted its handler to the scent of drugs from the car, the officer searched the vehicle and the backpack. Inside the backpack, he found a handgun, methamphetamine, fentanyl, and cocaine.

¶ 8 The People charged Crespin with several offenses, including, as relevant here, possession with intent to distribute methamphetamine, possession with intent to distribute fentanyl, and possession with intent to distribute cocaine. Before trial, Crespin moved to suppress the statements he made to the officer

before the shoplifter's vehicle was searched.[2]  The district court denied Crespin's motion.

¶ 9      The case went to trial.  Crespin's theory of defense was that the backpack belonged to the shoplifter.  However, the prosecution used Crespin's statement to the officer that there was a gun in the bag, along with other evidence, to link the backpack to Crespin.  Ultimately, the jury found Crespin guilty of each of the possession charges.

## II.    Analysis

¶ 10     Crespin contends that the district court erred by not suppressing his statement that there was a gun in the backpack.  He claims that he made this statement during a custodial interrogation without first being informed of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  We disagree.

### A.    Standard of Review and Applicable Law

¶ 11     In reviewing a ruling on a motion to suppress, we ordinarily defer to the district court's factual findings if they are supported by

---

[2] Crespin's motion argued that all the statements he made after the officer told him to leave the car should be suppressed.  But on appeal, Crespin contends only that his statement about the handgun should have been suppressed.

the record and review the court's application of law de novo. *People v. Willoughby*, 2023 CO 10, ¶ 18. But when, as here, the challenged incident is video recorded and there are no relevant disputed facts outside of the recording, we are in a position similar to the district court to resolve the issues. *People v. Taylor*, 2018 CO 35, ¶ 7. Therefore, we may conduct an independent review of the officer's body camera footage to determine whether Crespin's statement should have been suppressed under controlling law. *See id.*

¶ 12    Under *Miranda*, the prosecution may not introduce in its case-in-chief statements made during custodial interrogation, unless the police preceded the interrogation with certain warnings. *People v. Davis*, 2019 CO 84, ¶ 16. *Miranda* warnings are only required when a suspect is subject to both interrogation and custody. *Id.* Because we conclude that Crespin was not in custody, we need not address whether he was under interrogation.

¶ 13    A suspect is in custody if "a reasonable person in the suspect's position would believe himself to be deprived of his freedom of action to the degree associated with a formal arrest." *Id.* at ¶ 17 (quoting *People v. Hankins*, 201 P.3d 1215, 1218 (Colo. 2009)). In

5

making this determination, we consider the totality of the circumstances, including such factors as

> (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

*People v. Matheny*, 46 P.3d 453, 465-66 (Colo. 2002) (quoting *People v. Trujillo*, 938 P.2d 117, 124 (Colo. 1997)). This list is not exhaustive, and no single factor is determinative. *Davis*, ¶ 19.

## B.    Discussion

¶ 14    Applying the *Matheny* factors under the totality of the circumstances, we conclude that Crespin was not deprived of his freedom of action to the degree associated with a formal arrest and therefore was not in custody. The following facts weigh against finding custody:

6

- Although the encounter took place at night and in the cold, it occurred in a public parking lot for a business that was still open. *See People v. Pleshakov*, 2013 CO 18, ¶ 30 (A "conversation [that] took place in public view so that passersby could have witnessed the interaction" weighed against custody.).

- Although another officer arrived on scene to keep an eye on the vehicle occupants once they were asked to stand by the curb, the record shows that only the initial officer spoke with Crespin. Indeed, when Crespin made the challenged statement, he was in a one-on-one conversation with the initial officer, away from everybody else at the officer's suggestion. *See id.* (a single officer conversing alone with the defendant while the "remaining officers engaged in other tasks" weighs against custody); *People v. Clark*, 2020 CO 36, ¶ 33 ("We have previously relied on the fact that only a single officer spoke with a suspect in concluding that the suspect was not in custody during the encounter at issue.").

- The officer's words and tone generally remained conversational and nonconfrontational. *See Pleshakov*, ¶ 31 ("[T]here [wa]s no showing that [the police officer] informed [the defendant] he would be charged with an arrestable offense or that [the officer] presented [him] with the evidence against him in a threatening or confrontational manner."); *People v. Cowart*, 244 P.3d 1199, 1204 (Colo. 2010) (holding that the defendant was not in custody in part because the officer spoke with him in a conversational tone). The officer told Crespin and another occupant that they had the right to refuse a pat-down search, and Crespin did refuse to be searched without issue.[3]

- Crespin made the challenged statement less than fifteen minutes into the encounter, and, for much of that time, the officer was not directly interacting with Crespin. *See People v. Begay*, 2014 CO 41, ¶ 27 (concluding the defendant was not in custody in part because the

---

[3] The third occupant had told the officer that he had a knife on him and was not given the option to refuse a pat-down search.

encounter lasted less than twenty minutes).  The overall mood of the encounter remained calm and nonconfrontational throughout.  *See People v. Theander*, 2013 CO 15, ¶ 33 (factor weighing against custody was the pleasant and nonconfrontational mood of the encounter).  The officer's "few pointed questions and [his] exhortations to be honest did not render the overall mood of the interrogation aggressive or accusatory." *Davis*, ¶ 34.

- During the encounter, the officer did not handcuff or physically restrain Crespin or the other vehicle occupants.  *See Pleshakov*, ¶ 21 (noting that cases have "focused on the degree of physical restraint employed by officers in determining whether a suspect was in custody"); *Cowart*, 244 P.3d at 1204 ("[T]he lack of physical restraint suggests to us that [the defendant] was not in custody.").  Moreover, Crespin was able to take his vape pen with him and smoke while standing by the curb.  *Cf. Willoughby*, ¶ 36 ("No one who had their freedom of movement restrained to the degree associated

9

with a formal arrest would reasonably feel like they could smoke a cigar, let alone without asking for permission.").

- Overall, Crespin appeared calm during the encounter. *See People v. Garcia*, 2017 CO 106, ¶ 23 ("A calm emotional state suggests a person does not feel the pressures associated with custody."). He repeatedly denied having anything to do with the drug paraphernalia in the car and repeatedly expressed confusion as to why he was being detained and why his backpack could be searched. *Cf. Clark*, ¶ 34 ("[The defendant] generally deflected questions from [a detective] while repeatedly asking what items the police were seeking and expressing his lack of understanding as to why the police were there and how 'insane' it all was. . . . [T]his conduct . . . does not suggest a person who believed that he was in custody or who had in any way succumbed to any sort of coercive police interrogation."). Notably, Crespin initiated the conversation with the officer that led to his admission about the handgun.

¶ 15    These facts merely show that Crespin was being detained while the officer investigated the vehicle. They do not demonstrate that he was in custody for *Miranda* purposes. *See People v. Hughes*, 252 P.3d 1118, 1122 (Colo. 2011) ("[J]ust because a defendant is detained in an investigatory stop does not mean he or she is in custody for purposes of *Miranda*.").

¶ 16    Crespin emphasizes several aspects of the interaction that could weigh in favor of finding custody. For example, he asserts that the officer twice asking him, "Do you need to go in handcuffs?" suggests that he was in custody. However, these questions were posed after Crespin repeatedly refused to either allow the officer to search the backpack or else leave it behind in the car. Thus, the officer was suggesting that Crespin would be restrained if he attempted to take the backpack, not that Crespin needed to be restrained because he was in custody. Similarly, the officer's statements that "the fact that you're in the car [that has the wrong plates on it], you're not free to go"; that "once I saw the paraphernalia, that's even more of you're not free to go"; and that the paraphernalia "could've easily came from you" were made in response to Crespin's inquiries about why he was being detained,

11

not to suggest that Crespin was going to be arrested.  Viewing the officer's words in context, "we cannot conclude that a reasonable person in [Crespin's] position would believe that he was restrained to a degree tantamount to a formal arrest, regardless of the questions and statements made by" the officer.  *People v. Stephenson*, 159 P.3d 617, 623 (Colo. 2007).

¶ 17    We are not swayed by Crespin's reliance on *People v. Null*, 233 P.3d 670, 677 (Colo. 2010); *People v. Polander*, 41 P.3d 698, 705 (Colo. 2001); *People v. Taylor*, 41 P.3d 681, 692-93 (Colo. 2002); *People v. Thomas*, 839 P.2d 1174, 1178-79 (Colo. 1992); and *People v. Verigan*, 2015 COA 132, ¶¶ 21-27, *aff'd on other grounds*, 2018 CO 53.  At the time of interrogation in each of these cases, either the defendant was physically restrained, or it was apparent that an arrest was imminent, or both.  *See Null*, 233 P.3d at 677 (The defendant was "'surrounded' by the patrol car and the officers on either side of him" when he was questioned and had already "failed two sobriety tests and the preliminary breath test before the interrogation began."); *Polander*, 41 P.3d at 705 ("[T]he defendant had every reason to believe she would not be briefly detained and then released as in the case of an investigatory stop or a stop for a

12

minor offense."); *Taylor*, 41 P.3d at 692-93 (The defendant "was surrounded by armed uniformed police officers and their patrol cars and was 'essentially encircled next to the pickup truck while the interrogation occurred.'"); *Thomas*, 839 P.2d at 1178 (Drug paraphernalia was found on the defendant's person, and he "was told that he was being detained and, at the very least, would receive a ticket."); *Verigan*, ¶ 26 (The defendant owned the car that the police saw drug paraphernalia in, she was escorted to the car for questioning by a police officer, and police officers told her that "they had called a female officer to the scene to conduct a more thorough search of [the defendant's] person.").

¶ 18    In contrast, the facts of this case are more similar to those in *Stephenson*, 159 P.3d at 623. In *Stephenson*, a police officer asked the defendant and his passenger to exit the car and stand nearby while the officer performed a consensual search of the vehicle. *Id.* at 619-20. After the search, the officer — without giving a *Miranda* advisement — confronted the defendant with a small baggie of methamphetamine found in the driver's seat, and the defendant ultimately admitted that the baggie belonged to him. *Id.* at 620. The supreme court held that the defendant's admission should not

have been suppressed. *Id.* at 623. The court concluded that having the defendant exit and stand behind the vehicle was "for his own safety and to facilitate the search of the vehicle" and was not a restraint on freedom of action tantamount to a formal arrest. *Id.* at 623. And even though the officer had already found drugs in the seat where the defendant had been sitting before the defendant made the inculpatory statement, the court concluded that it was not apparent that the defendant would be arrested because he had "repeatedly denied owning the vehicle that he was driving, and [the police officer's] records check confirmed that [the defendant] did not own the vehicle where the drugs were found." *Id.*

¶ 19 Like in *Stephenson,* Crespin was not physically restrained in any way nor surrounded by police officers after he was told to stand by the curb to facilitate the officer's search. *See id.* Also like in *Stephenson,* and unlike most of the cases Crespin relies on, "it was not 'apparent to all' that there were grounds to arrest [Crespin] or that he would be arrested." *Id.* Although possession of drug paraphernalia is an arrestable offense, *see People v. Johnson,* 2024 CO 47, ¶¶ 42-43, Crespin (1) did not own the car in which the paraphernalia was found; (2) was one of four people (including the

14

shoplifter) who had been in the car; and (3) repeatedly disclaimed any involvement with the paraphernalia the officer spotted, which was across the car from where Crespin was sitting, *cf. Stephenson,* 159 P.3d at 623.

¶ 20    In summary, we conclude that the totality of the circumstances demonstrates that Crespin was not in custody when he told the officer that there was a gun in the backpack, and, thus, the district court did not err by denying his suppression motion.

### III.    Disposition

¶ 21    The judgment is affirmed.

JUDGE TOW and JUDGE GRAHAM concur.