22CA2251 Peo v Nichols 11-26-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA2251
Garfield County District Court No. 21CR201
Honorable John F. Neiley, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Padrikea Deangelo Nichols,

Defendant-Appellant.

---

JUDGMENT AND ORDER AFFIRMED

Division III
Opinion by JUDGE DUNN
Lipinsky and Kuhn, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 26, 2025

---

Philip J. Weiser, Attorney General, Allison S. Block, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Taylor J. Hoy, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     For shooting his ex-wife's husband, a jury convicted Padrikea Deangelo Nichols of first degree assault.  Nichols appeals his conviction, arguing that the district court reversibly erred by (1) denying his motion to suppress statements he made the night before the shooting; (2) admitting other act evidence under CRE 404(b); (3) admitting video exhibits showing him in jail attire; (4) allowing a detective to give expert testimony about cell-site location data; and (5) allowing the prosecutor to commit misconduct in closing argument.  Nichols also argues that the cumulative effect of these errors requires reversal.  Because we disagree, we affirm the judgment of conviction.

¶ 2     Nichols also challenges the restitution order, claiming that the district court plainly erred by accepting defense counsel's waiver of his presence at the restitution hearing.  We again disagree and affirm the restitution order.

## I.     Background

¶ 3     The night before the shooting, Nichols met his ex-wife for drinks.  While they were out, her then husband, the victim, called Nichols's ex-wife and threatened her and Nichols.  Nichols grabbed the phone and started arguing with the victim.

¶ 4     Someone called 911 about a possible domestic disturbance and two officers responded just after midnight.  Officer Drew Oesterle first spoke with Nichols and was later joined by Officer Alicia Hampton.  Officer Oesterle's body camera recorded the roughly four-minute interaction — during which Nichols described the threats the victim had made to him and his ex-wife.  Nichols added that if he saw the victim, he would "fuck him up," that Nichols was the wrong dude to mess with, and people should not cross him.  Nichols also said he had "a legal right to carry arms and . . . will fire" in self-defense.  After requesting and reviewing his identification, the officers cleared Nichols and said he could go.  While walking away, Officer Hampton heard Nichols say something like "pop, pop, pop 'em."

¶ 5     The next evening, Nichols was on the phone with his daughter, who lived with his ex-wife and the victim.  Nichols overheard the couple arguing and the victim threatening Nichols's ex-wife.  Nichols then drove to the victim's house.  After a brief confrontation, Nichols shot the victim three times, seriously injuring him.  Nichols then sped away.  The confrontation and shooting were captured on security video.

¶ 6     The prosecution charged Nichols with attempted first degree murder and first degree assault.  At trial, Nichols asserted self-defense.  The jury acquitted Nichols of attempted murder but found him guilty of assault.  The district court sentenced Nichols to twenty-four years in prison and ordered restitution.

## II.     Motion to Suppress

¶ 7     Nichols contends that the district court erred by denying his motion to suppress his statements to officers the night before the shooting.  Nichols says the statements were the product of a custodial interrogation in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).  We aren't persuaded.

### A.     Legal Principles and Standard of Review

¶ 8     To protect the Fifth Amendment privilege against self-incrimination, officers must provide certain warnings before they question someone who is in custody.  *Id.* at 444; *see People v. Eugene*, 2024 CO 59, ¶ 14.  If they do not, any resulting statements are inadmissible.  *Effland v. People*, 240 P.3d 868, 873 (Colo. 2010).

¶ 9     A person is in custody for *Miranda* purposes when formally arrested, or "if, under the totality of the circumstances, a reasonable person in the suspect's position would have felt that

3

[his] freedom of action had been curtailed to a degree associated with formal arrest." *Eugene*, ¶ 15 (citation omitted). This standard requires a greater restriction on freedom than that necessary for a Fourth Amendment seizure. *See People v. Davis*, 2019 CO 84, ¶ 21.

¶ 10    To determine whether an individual was in custody, we consider, among other factors, (1) the time, place, and purpose of the encounter; (2) the persons present during the encounter; (3) the words spoken to the individual; (4) the officers' tone of voice and demeanor; (5) the length and mood of the encounter; (6) whether officers placed any limitation of movement or other form of restraint on the individual; (7) the officers' response to any questions the individual asked; (8) whether the officers gave directions to the individual; and (9) the individual's response to such directions. *Eugene*, ¶ 15.

¶ 11    Whether a person is in custody for *Miranda* purposes is a mixed question of law and fact. *People v. Bohler*, 2024 CO 18, ¶ 17. We defer to the district court's factual findings when supported by the record, although we may independently review police bodycam video. *Id.* We review de novo the legal question whether those facts, taken together, establish that the person was in custody. *Id.*

4

## B.    Nichols Wasn't in Custody

¶ 12    Considering the nonexhaustive factors outlined above and based on our own independent review of the bodycam video, we conclude that, at the time Nichols made the challenged statements, his freedom was not restrained to the degree associated with formal arrest.

¶ 13    Though the encounter occurred just after midnight, the officers contacted Nichols on a public and lighted sidewalk with onlookers strolling past.  *See id.* at ¶ 20 (finding questioning at night to be neutral because of public location next to a street and officers not arranging the time and place).  And the purpose was to investigate a possible domestic disturbance, not to "elicit incriminating information" as Nichols characterizes it.  Indeed, no crime had been committed at that point.

¶ 14    Consistent with the investigatory nature of the encounter, the officers' tones were "calm and conversational," *Davis*, ¶¶ 33-34, with one officer saying, "It's all good man.  We're just making sure. Somebody was worried that you guys were arguing out there, so we're just checking on you to make sure everyone's safe."  The

officers were not, as Nichols claims, "confrontational and accusatory."

¶ 15    While the officers were in uniform and armed, they never drew their weapons, displayed force, or threatened Nichols. *See People v. Willoughby*, 2023 CO 10, ¶ 34. Nor did they handcuff or physically restrain Nichols. *See Mumford v. People*, 2012 CO 2, ¶ 17. Unrestrained, Nichols moved about during the encounter and smoked a cigarette. *Willoughby*, ¶ 36 ("No one who had their freedom of movement restrained to the degree associated with a formal arrest would reasonably feel like they could smoke a cigar, let alone without asking for permission.").

¶ 16    The entire interaction lasted just four minutes. *See id.* at ¶ 33 (noting that the shorter the encounter, the less likely that it is custodial). And during that brief time, Nichols did most of the talking, volunteering his version of the night's events with little questioning or prompting by the officers. *See Niemeyer v. People*, 2024 CO 58, ¶¶ 26-27, 30 (determining that open-ended conversational questions and long-form narrative responses going beyond the scope of the initial question weigh against custody).

¶ 17 Other than Officer Oesterle's request for identification and statement to Nichols to wait until they cleared him, the officers did not give Nichols any directions. A request for identification and a brief detention don't create custody for *Miranda* purposes. *See People v. Stephenson*, 159 P.3d 617, 622 (Colo. 2007) ("[W]e have never held that retaining a driver's license . . . creates custody for *Miranda* purposes."); *see also People v. Klinck*, 259 P.3d 489, 495 (Colo. 2011) (concluding that the defendant was not in custody where the police asked for the defendant's identification, had him wait while they spoke with the victim, and then questioned the defendant).

¶ 18 Because Nichols wasn't in custody, we conclude that the district court properly denied Nichols's motion to suppress his statements to the officers.

### III. Other Act Evidence

¶ 19 Over Nichols's objection, the district court allowed Officer Hampton to testify that she overheard Nichols say something like "pop, pop, pop 'em" the night before the shooting. Nichols contends that the statement was extrinsic other act evidence and the court erred by admitting it under Rule 404(b). We disagree.

7

## A.    Legal Principles and Standard of Review

¶ 20    Evidence of other crimes or acts is not admissible "to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character."  CRE 404(b)(1). But such evidence is admissible for nonpropensity purposes.  *Rojas v. People*, 2022 CO 8, ¶ 28; CRE 404(b)(2).

¶ 21    To evaluate whether other act evidence triggers Rule 404(b), a court "must first determine if the evidence is intrinsic or extrinsic to the charged offense."  *Rojas*, ¶ 52.  If the acts are intrinsic, meaning they either (1) directly prove the charged offense or (2) occurred contemporaneously with it and facilitated its commission, then Rule 404(b) doesn't apply.  *Id.* at ¶ 44.  The admissibility of intrinsic evidence is governed by the general evidentiary rules of relevance and prejudice.  *See id.* at ¶ 52.

¶ 22    But if the other act evidence suggests bad character and is extrinsic to the charged offense, Rule 404(b) applies.  To be admissible under Rule 404(b), such evidence must be (1) logically relevant (2) to a material fact (3) independent of the prohibited inference of the defendant's bad character, and (4) the probative

value of the evidence must not be substantially outweighed by the risk of unfair prejudice. *See id.* at ¶ 27.

¶ 23 We review a district court's evidentiary rulings, including the admission of other act evidence, for an abuse of discretion. *People v. Lancaster*, 2022 COA 82, ¶ 37.

### B. The Other Act Evidence Was Admissible

¶ 24 Nichols agrees that the statement is related to a material fact and is logically relevant. But he says the court should not have admitted it because the statement's logical relevance is not independent of the prohibited propensity inference and any probative value is outweighed by unfair prejudice.[1]

¶ 25 We disagree with Nichols that the statement is not logically relevant to a material fact.[2] A jury could reasonably consider the statement as circumstantial evidence that Nichols intended to shoot

---

[1] Because the statement neither directly proved the charges, nor occurred contemporaneously with and facilitated Nichols's alleged crime, we disagree with the People that the statement was intrinsic evidence. *See Rojas v. People*, 2022 CO 8, ¶ 52.

[2] To the extent Nichols argues that the prosecution did not articulate a precise evidential hypothesis for the admissibility of the statement independent of the prohibited propensity inference, we disagree. The prosecution argued that the statement demonstrated Nichols's motive and intent to shoot the victim.

9

the victim. That logical relevance is independent of the inference that Nichols acted in conformity with a bad character. To the extent the statement could support a propensity inference, Rule 404(b) does not demand the absence of any possible propensity inference. *See People v. McBride*, 228 P.3d 216, 227 (Colo. App. 2009).

¶ 26 We also disagree with Nichols that the statement was unfairly prejudicial. Because intent can rarely be proved by direct evidence, the statement had substantial probative value to prove that Nichols intended to shoot the victim. And any prejudice flowing from the probative value of the statement is not unfair. *See People v. Dist. Ct.*, 785 P.2d 141, 147 (Colo. 1990) (evidence is not "unfairly prejudicial simply because it damages the defendant's case"). Indeed, the statement — "pop, pop, pop 'em'" — is not particularly inflammatory and was not likely to "unduly inflame the passions of the jury" as it considered the charges. *People v. Cross*, 2023 COA 24, ¶ 26.

¶ 27 Thus, the court did not abuse its discretion by admitting the statement under Rule 404(b).

## IV. Video Evidence

¶ 28    Nichols next argues that the district court erred by admitting three redacted video clips that, to varying degrees, show him handcuffed and either wearing jail attire or being fitted for jail attire.  He maintains that the evidence undermined his due process rights and his presumption of innocence.  We disagree.

### A. Legal Principles and Standard of Review

¶ 29    The parties dispute whether Nichols preserved his objection with respect to one video clip, as the parties stipulated to its admission.  Because the evidence was properly admitted, we needn't resolve this dispute.

¶ 30    "The presumption of innocence, although not articulated in the Constitution, is a basic component of a fair trial under our system of criminal justice." *Perez v. People*, 2013 CO 22, ¶ 16 (quoting *Estelle v. Williams*, 425 U.S. 501, 503 (1976)).  When a defendant is required to appear before the jury in visible restraints or prison clothes, this presumption is directly undermined because it is a "constant reminder of the accused's condition" that "may affect a juror's judgment." *Estelle* 425 at 504-05.  That risk "is not present when the jury is shown a video depicting the defendant in a

11

prison uniform," however, because "[m]ost jurors would not be surprised by the fact that a defendant was handcuffed and wearing jail clothing while in jail prior to trial." *People v. Thames*, 2019 COA 124, ¶ 49 (citation omitted).

¶ 31   We review a district court's ruling on the admissibility of evidence for an abuse of discretion. *People v. Schnorenberg*, 2025 CO 43, ¶ 16. To the extent Nichols alleges a constitutional violation, we review that allegation de novo. *People v. Cuevas*, 2024 COA 84, ¶ 21.

### B.   The Video Clips Were Properly Admitted

¶ 32   Nichols argues that his "presumption of innocence did not remain intact" because the video clips "served as a constant reminder of his incarceration" during the trial.

¶ 33   A review of the video clips shows otherwise. The three redacted video clips total approximately twenty-four minutes of a multiday trial. And of those twenty-four minutes, Nichols is seen handcuffed and wearing jail attire (or being fitted for jail attire) for less than three minutes. Even then, Nichols is covered by a jacket much of the time. Thus, the three video clips briefly showing Nichols in prison attire and handcuffs during a lengthy trial with

12

dozens of witnesses and exhibits hardly acted as a "constant reminder" of Nichols's temporary custody. *See Thames*, ¶ 50 (rejecting argument that a video slightly over an hour long showing the defendant in prison attire was a constant reminder of the defendant's condition that violated the presumption of innocence); *cf. Estelle*, 425 U.S. at 504-05 (holding that the defendant's right to a fair trial was violated when he was compelled to wear identifiable prison clothing during his trial, which was a "constant reminder of the accused's condition" that may have affected the jury's judgment).

¶ 34     For these reasons, we conclude that the video clips did not violate Nichols's constitutional rights to due process or the presumption of innocence. The court therefore did not abuse its discretion by admitting the videos at trial.

## V.     Expert Testimony

¶ 35     Over Nichols's objection, the district court allowed a former detective to offer expert testimony about cell-site location data, finding that the testimony fell within the scope of the expert's endorsement, which broadly included homicide and violent crime investigations. The detective then testified about his review of

Nichols's cell phone location data and how it contradicted Nichols's story of where he was just before the shooting.

¶ 36    Nichols raises various objections to the detective's testimony.

¶ 37    But we needn't decide whether the court erred by allowing the testimony because any error was harmless. *See Krustinger v. People*, 219 P.3d 1054, 1062-63 (Colo. 2009) (reviewing preserved objection to expert testimony for harmless error). After all, Nichols admitted to shooting the victim but claimed he acted in self-defense. The central dispute at trial was not where Nichols said he was before the shooting. Rather, it was whether Nichols lawfully defended himself from what he reasonably believed to be the use or imminent use of unlawful physical force. *See* § 18-1-704, C.R.S. 2025 (outlining elements of self-defense). The detective's cell-site location data testimony shed no light on Nichols's intent or the self-defense claim. And even if it raised some question about Nichols's credibility, because the shooting was captured on video, the jury could independently assess the actions of Nichols and the victim without regard to their prior actions. Put simply, Nichols's location before the shooting was irrelevant.

¶ 38    Because the admission of the testimony did not substantially influence the verdict or affect the trial's fairness, any error in allowing it was harmless.

## VI.    Prosecutorial Misconduct

¶ 39    Nichols next contends that the prosecutor made multiple improper comments during closing argument.  We see no misconduct.

### A.    Legal Principles and Standard of Review

¶ 40    We apply a two-step analysis to claims of prosecutorial misconduct.  *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).  We first determine "whether the prosecutor's questionable conduct was improper based on the totality of the circumstances."  *Id.*  If it was improper, we then determine whether the misconduct warrants reversal.  *Id.*

¶ 41    Because Nichols didn't object to any of the prosecutor's statements, we will reverse only if any misconduct was plain error.  *See People v. Licona-Ortega*, 2022 COA 27, ¶ 88.  To constitute plain error, any prosecutorial misconduct must be obvious and "must be flagrant or glaring or tremendously improper, and it must so undermine the fundamental fairness of the trial as to cast serious

15

doubt on the reliability of the judgment of conviction." *Id.* (citation omitted).

## B. Misstatement of Facts

¶ 42 Nichols argues that the prosecutor misstated the evidence in the following comments made during closing:

- "[W]hy didn't [Nichols] go check on [his ex-wife]? He wasn't concerned for her safety."

- "The only evidence of anyone threatening to kill anyone during [the phone] conversation is [Nichols] threatening to kill [the victim]."

- "[The victim] never had a gun."

- "[Nichols's ex-wife] testified that [the victim's] hands were open, palms forward. And that's what the video shows, too."

¶ 43 Read in context, all these comments are tied directly to the record or reasonable inferences from the record. It's undisputed that Nichols dropped his ex-wife off at her house and only texted her — but did not return to the house — after the victim had threatened her. The references to Nichols's threats and the victim's gun ownership were limited to specific conversations. And the video

of the shooting showed that the victim did not have a gun.[3] That the prosecutor highlighted certain facts and didn't address others that could lead to a different conclusion does not make the argument improper. *See Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005) (explaining that during closing argument, counsel may "point to different pieces of evidence and explain their significance within the case").

C.     Arguments Calculated to Inflame the Jurors' Passions

¶ 44     The prosecutor argued, "There was no reasonable belief that firing a nine-millimeter handgun five times was necessary under these circumstances. . . . *We don't even do that in war, shoot a person that's already wounded on the ground.* That's not self-defense." (Emphasis added.)

¶ 45     Nichols argues that the emphasized portion of the argument was improper and calculated to inflame the jurors' passions. But the argument was tethered to the video evidence showing Nichols

---

[3] While the prosecutor's statement that the victim's hands were open with palms forward may have been somewhat inaccurate, it was hardly a flagrant or glaring misstatement. And, at any rate, the jury had the video and could independently assess whether the victim's hands were raised or down.

shooting the victim while the victim was on the ground. Though the language may be dramatic, it is not improper to "engage in oratorical embellishment." *People v. Samson*, 2012 COA 167, ¶ 31. And the statement did not invite the jury to decide the case on anything other than the evidence.

## VII. Cumulative Error

¶ 46 Nichols asserts that, collectively, the district court's errors violated his right to a fair trial, entitling him to a new one. *See Howard-Walker v. People*, 2019 CO 69, ¶ 24. But cumulative error requires multiple errors resulting in cumulative prejudice. *Id.* at ¶ 25. Because we disagree that the district court committed multiple errors, cumulative error doesn't apply.

## VIII. The Restitution Hearing

¶ 47 Defense counsel objected in writing to the prosecution's requested restitution and asked for an evidentiary hearing. The objection twice stated that Nichols "requests that he be excused from such a hearing." And though the prosecution filed a writ for Nichols to appear at the restitution hearing, it later moved to vacate it because Nichols had "waived his appearance" for the hearing. The court then vacated the writ.

18

¶ 48      At the restitution hearing, the court said that Nichols's "personal appearance or WebEx appearance was waived by agreement of the parties." Defense counsel did not object and, instead, represented Nichols at the hearing.

¶ 49      Nichols now contends that the restitution order should be vacated because he wasn't present at the hearing and "there is no evidence Nichols voluntarily, knowingly, and intelligently waived his right to be present."

¶ 50      To be sure, a defendant has the right to be present at all critical stages of a criminal proceeding, which includes restitution hearings. *People v. Martinez Rubier*, 2024 COA 67, ¶ 61. But the right is not absolute; a defendant may waive his right to be present. *People v. Janis*, 2018 CO 89, ¶ 17.

¶ 51      Because defense counsel did not object to proceeding without Nichols present, we review for plain error. *People v. Hernandez*, 2019 COA 111, ¶ 29. An error is plain in the restitution context when it is obvious, meaning that it casts serious doubt on the reliability of the restitution award. *Id.* at ¶ 30.

¶ 52      Under these circumstances, we are unconvinced that any error was plain. Because defense counsel represented in writing that

Nichols asked to be excused from the hearing, did not object when the prosecutor moved to vacate the writ, and did not object when the court said that Nichols had waived his appearance, we are skeptical that the district court obviously erred by proceeding without Nichols present.

¶ 53     But even assuming the court should have inquired further, Nichols doesn't explain how his absence from the restitution hearing "so undermined the fundamental fairness of the [hearing] itself so as to cast serious doubt on the reliability" of the outcome. *Hagos v. People*, 2012 CO 63, ¶ 14 (citation omitted).  Indeed, Nichols doesn't say how his presence would have affected the hearing or what testimony he could have added that might have affected the restitution order.  We therefore can't conclude that any error in proceeding without Nichols was substantial enough to be plain.  *Cf. Hernandez*, ¶ 24 ("[I]f particular facts show that the defendant's presence would be useless or only slightly beneficial, proceeding in the defendant's absence will be harmless beyond a reasonable doubt.").

¶ 54     We are unpersuaded that *Hernandez* requires a different result.  In that case, defense counsel planned "to writ" the

defendant to the restitution hearing but "didn't do that." *Id.* at ¶ 4. Defense counsel did not represent that the defendant asked to be excused or did not want to be present. Even so, defense counsel asked to waive the defendant's presence and proceed without the defendant. *Id.*

¶ 55 That's very different from what happened here. Defense counsel did not forget to obtain a writ for Nichols's appearance at the restitution hearing. Rather, before the restitution hearing, defense counsel represented that Nichols asked to be excused. Despite several later opportunities to demand Nichols's presence, defense counsel never suggested that Nichols's position had changed and that he wanted to be present.

¶ 56 Because we cannot conclude that the district court plainly erred by proceeding with the restitution hearing without Nichols present, we affirm the restitution order.

## IX. Disposition

¶ 57 The judgment of conviction and restitution order are affirmed.

JUDGE LIPINSKY and JUDGE KUHN concur.